Timothy Coates again on behalf of the county and Dr. Garthway. This is in some respects the counterpoint to the Roddy case, which is kind of a one-two punch and kind of I think illustrates that whip-sawing back and forth that the county has between interest groups and patient populations. That is, the county has a very broad mandate in terms of the people that it serves. Its basic mandate, though, is to serve the indigent population as defined by the state statutes. And I think in this case, unlike the Roddy case, I think the inappropriateness for intervention by way of an injunction is illustrated most particularly by the standing issue because I think it informs that issue because it's the type of thing that courts aren't particularly good at awarding relief at because there's such an attenuation between the relief sought and the injury to be addressed by the plaintiffs. And that's what we have here. I think it's critical in looking at the standing issue that plaintiffs kind of try to bulk it all together. Whereas, as noted and I think consistent with the case law where you have individual plaintiffs, it's not a class action case, you have to look at the individual standing of each particular plaintiff. And I think it's kind of double here, which is not just the individual plaintiff but the nature of the claim of injunctive relief they're making because you have the two claims. You have the attempt to stop the county from reducing beds at County USC Medical Center. Then you have the one that stopped the county from closing Rancho. And I think the plaintiffs, the individual plaintiffs' interests are widely divergent in terms of their ability to pursue those claims. For example, I think with respect to the reduction in beds, one group of plaintiffs are people who just happen to use the county hospital system. Some of them use clinics. Some of them go to county. But the general allegation is they use county facilities other than Rancho and they're dependent upon that care. Well, the injunctive relief they seek, which is to stop the reduction of beds, there's no direct link between that and the care that they receive. What we have here is this extremely long set of assumptions that I might go to a hospital, I might be a county hospital, my care might be delayed, I might need one of these beds that's been reduced. But I think just the cases that we cite from the Supreme Court indicate that's just too attenuated a link to give these people standing with respect to stopping the reduction of those beds. Well, they already have people in the hallways on gurneys, haven't they, in the hospital? Yeah, but that's the injury of the particular plaintiff itself has to be redressed by this type of injunction. The fact that we may not reduce the beds, there's no clear link between that and any of the care that these individual plaintiffs are going to get. When do they wait? Until they get injured? Have to go to the emergency room? Well, it may be a circumstance that it's not something that's redressable by injunctive relief at all. I mean, the Lyons case is the paradigm example of that with the police chokehold is the court said, look, you know, the nature of this, there's so many other factors out there, you can't assume a person's going to be arrested, you can't assume a police officer's going to use excessive force, what have you. No standing for injunctive relief. Now, damages claim under some theory, but But your client would prefer to pay a lot of damages than to fix the problem ahead of time? No, but we understand as an institutional basis in terms of being able to operate the government, in terms of being able to budget something that's hundreds of millions of dollars, there's a world of difference between individual damage claim and injunctive relief. I mean, that's why injunctive relief is so damaging, particularly in these contexts, because there are so many interests that have to be weighed by the Board of Supervisors in making these budgetary decisions. And, you know, what you do on one side of the county system has an impact on the other. Let me just read to you, so we're working from a sort of a common base. I'm just reading from the district court's order, paragraphs 17 and 18 of the findings of the fact, which I'm sure you know. Reduction in bed LAC USC will increase the amount of time LAC USC is in ambulance diversion status. The current ambulance diversion rate will be increased. This leads to increased morbidity and mortality in transported patients. Paragraph 18, the closing of rancho and the proposed bed reduction at LAC USC will result in dangerous delays of needed medical treatment, resulting in unnecessary death, strokes, heart attacks, amputation, renal failure, blindness, seizures, severe pain, increased risk of infection will result in the spread of communicable disease, and it goes on. Now, are you saying that there's insufficient impact upon the population of plaintiffs here that they do not have standing under Article III? Is that the argument? Yes, that is. That is. With the individual plaintiffs, when you look at what they're alleging in terms of their use of the county hospital system, yes, I am. I think it's no different in other cases where the link of this particular plaintiff to suffer these damages is attenuated. I mean, I think that's the meaning of Wharton. I think it's the meaning of Lujan as well. That's a fine ultimate conclusion by the district court, but I think you have to draw, as in Lyons, the per-plaintiff link, and it is not done. Let's stay with Lyons. In Lyons, the man is stopped. I think the pretext for the stop is that there's a burnt-out taillight. We don't quite know the facts that lead to the sequence, but he ends up subject to the chokehold. By the time it's all over, he's unconscious, on the ground, having been injured. He then brings a suit, seeking not only damages but injunctive relief so that the LAPD will stop the chokehold. And the court says he has no Article III standing for the injunctive relief. He's okay on damages, as you stated, because there's insufficient likelihood that he will again be stopped and again be subjected to the chokehold. Well, on those facts, I can understand that, because, I mean, what is he? He's one person out of the entire population of Los Angeles. What are the chances of him actually being subjected to that again? That's not what's going on here. We have people who, in this population of particular plaintiffs, will need to use these services. That's right. Unlike Mr. Lyons, there's absolutely no showing, or I'll say it's so speculative, according to the Court, that he's ever again going to be stopped and subjected to a chokehold. For him, it's just too speculative. Here, these people are going to use these services. The question is, what's going to be the effect of this on the services they receive? And we've got a factual finding that the services are going to be worse. Well, if you look at the way these people use it, if you're saying these are people who may just happen to show up at a county hospital and they might suffer from this, it's the might that's the problem. But might suffer, well, it depends on how badly they suffer. I think it's unquestioned given to these things, there are going to be delays. Now, the delay may or may not kill them, but a delay may be enough to give them Article III standing. That's to say, I wait an hour, I wait two hours, waiting an additional hour, that is a measurable harm. Now, it's not as severe as death, but that may be enough for Article III. Well, but I think the point may be that because the reasons you go to a hospital are as individualized, I would submit, as the reasons you may possibly be arrested, which is to say, any one of these given plaintiffs could show up with a Class I emergency, and there's no certainty that they're going to wait. There's a triage program. I mean, they don't dispute that. I think what we're, the bone of contention here is you're talking about a general impact on the system, but you can't, there's no link can be drawn between that general impact and the individual plaintiffs. And I think my contention is that the Supreme Court case law requires something more than that. But that, I mean, and I think that the cases, I mean, Lyons illustrates it. What if there, what if the beds are reduced down to a hundred? And if you have a person who says, I need this bed, I have something, I absolutely need this bed. Perhaps. Not this case, though. I mean, the only plaintiff here who asserts he needs a bed is Mr. El-Hadini, and he's not talking about any of the beds that were targeted for reduction. But again, I think under the Supreme Court case law, these type of attenuated lists address general harms. And I'll acknowledge the factual funding by the district court on that as a generalized finding. But I think that doesn't get them off the hook. But the generalized finding says you're going to get a delay. And as I read this, and I think it's a fair, I don't think I'm pushing the language too hard. I think anybody who shows up at this county hospital is going to have an increased delay. Okay. I mean, I don't see when I look at the individual counties which these people are asserting, at least in their standing claim, I don't think that's manifest. I don't think you have that clear link between one and the other. But, I mean, that's how I read the Supreme Court case law. I think these people really are not any different than the people in Simon or in Lujan or in the Ward case. Well, they're pretty different from Lujan. Lujan, they claim they want to see an alligator in the Aswan. And they have no ticket, they have no plans to go there. I mean, these people, I think... Yeah, but the key in Lujan was the decision-making by third parties, too. I mean, I think... Well, that's what I mean. I think this case is a million miles away from Lujan. No, I mean, I think it may be that the focus I have is that in the medical care context, like the arrest context, you have such an overwhelming amount of individualized circumstances that you don't have that predictability. You don't have that solid link. But I think we can predict with some confidence that these people will try to use these hospital services. And I think from these findings, we have a fair degree of confidence in predicting that there will be some delay. I'm not sure I can go further than that and predict for any of these individual plaintiffs that as a result of these delays, that they will die or suffer these adverse consequences that are severe. But I don't know that I need that for Article III standing. It might go for reparability, but not for standing. Okay. I'm with you. I understand the argument. The second point is on what we consider the substantive basis of the claim, aside from standing. It's twofold here. One is under the California Welfare Institutions Code. The other is the narrow one dealing with Rancho with respect to the Medicaid Act. On the Welfare Institutions Code, the case Tailfeathers, I think, is very illustrative of the problem here. And you put that in contrast with the Cook case. The Cook case was talking about a very specific type of service, the dental care. And the Tailfeather case talked more about the results of the county's general policy of operating their clinical structure. And the Tailfeather court says no violation of the state statutes. And the plaintiffs in Tailfeathers allege pretty much the same kind of generalized problems the court was talking about in terms of the horrible system is that the delays in treatments, everything else. This means we're not getting the prompt and adequate care, proper care. The county has an obligation to provide us as indigents under the state statutes. And the court says, look, the county has in place these policies. And, you know, that's sufficient. That's what they're required to do is to have them in place. This is not like Cook where you have that very specific, very narrow type of claim for a particular service. And I think that when you measure the county's liability or obligation rather under the state statutes, it's that the requirement to provide subsistence level care. We have a strategic plan in place. And this is precisely the type of kind of institutional claim that the Tailfeather court rejects. The second point is on the Medicaid aspect. The only person that I can see of the plaintiffs that apparently has the Medicaid claim based upon the ever popular discharge planning regulation that we're talking about appears to be Mr. Harris. And it's not even clear that he qualifies for the discharge planning under the evidence. And the district court injunction is clearly somewhat broader than just saying the county has an obligation to provide discharge planning. It is you just have to keep Rancho open. So that's something where the injunction itself isn't really tailored to the nature of that legal claim. And again, it's one of those things that we're talking about specific entitlement to relief measured against the injunction. We just don't have that here. Turning to the irreparable harm aspect of this, I think the irreparable harm that the county suffers here is kind of given short shrift, which is the county's not saving money for the purpose of saving money. I mean, it's trying to manage a healthcare system that serves an awful lot of people. And the district court kind of tossed it aside by saying, look, any budget deficit is in the future. And that ignores the fact that you can't just come upon a budget deficit. You have to plan for it. And that planning for it means reduction of other services. And so you keep Rancho open. You don't reduce the beds at County USC. You end up having to make decisions that affect other patients, other people who are not in front of the court. I think we all understand that the county is between a rock and a hard spot. I mean, if the county had enough money, the county would not be proposing this. On the other hand, if there are judicially enforceable legal obligations that the county must satisfy, and if those obligations are not stated in terms of if the county has enough money, but rather simply stated that these are obligations, that's not a problem we're prepared to deal with. That's true. But it goes into the sliding scale of the degree of irreparability stemming from the alleged violation of the statutory obligation and the irreparability of the harm to the county of having to adjust for those budget systems. I mean, I think you need a clear entitlement to relief here, not just a serious question given where the county is in terms of the harm that it has to the budgeting process. Again, this isn't the notion that this is only going to occur in 05 or 06 or 06 or 07. I mean, we have to do the planning for that now. I mean, we can't afford to have the whole health care system crash. And I don't think that that's a minor bit of weight on the scale. I think the district court just kind of said, look, I'll deal with the people in front of me, not with tomorrow. We can't do that. And the decisions that are coming tomorrow, some of them we have to make today. And they affect people. The district court did take that into consideration. Well, all the district court said was this budget impact may be in the future. But it doesn't talk about the fact that the decisions with respect to the budget deficit have to be taken out. I don't think it's been denied that the county has to reduce it. I mean, they have to come up with this money somehow. What you're talking about here is a preliminary injunction. That's right. A lot of this you can bring up. Well, but I think the point is that if the district court immediately starts at zero there, essentially zero, and ignores what ends up being massive irreparable harm to the county because of the budgeting process and the fact that it necessitates cuts elsewhere, then it is appropriate on a preliminary injunction. Because then it's not enough for just serious questions about legal entitlement to relief. I think you need to have dead-bang solid evidence, dead-bang solid legal grounds for doing that, because make no mistake about it, the disruption to the county budgeting system, the disruption to other programs is very, very real. So with that, I'll reserve the rest of my time for rebuttal. Good afternoon, Your Honors. I'm Mark Rosenbaum. I'm here with Yolanda Vera, representing plaintiffs. I will be dealing with issues regarding federal law, standing question, discharge planning. Ms. Vera will deal with state law issues in this case. I expect to be very brief, Your Honor. I want to talk very quickly about the standing question  Your Honor, I want to talk very quickly about the standing question It's certainly correct, Judge Fletcher, that the standard here, as the Ninth Circuit said, page 950 of the Delta Water Agency case, the Central Delta Water Agency case, is have we demonstrated a credible threat, have we shown a significant risk of the injury that's required. We don't have to wait for the injury to actually occur in cases like the Delta Water Agency case. Those are environmental cases, and the Court said, look, you don't need to have to wait for the law to be affected in such a way that there is damage to the environment. Certainly, in a case involving the sorts of health care needs and stakes that are involved in this case, no different standards should apply. I was planning, Your Honor, to read the very sections that the Court did refer to with respect to paragraphs 17 and 18 of the District Court's findings. I note in this matter that, while counsel makes pretty much the same argument that was made to the District Court, there is no argument in the briefs that were filed or that were made this morning by Mr. Coates that any of those findings were clearly erroneous, that they were not supported by the record. As counsel said in the prior case, nor could there have been. In this case, there was a 3,000-page record. There were statements, declarations, from eight county doctors about preventable deaths that had been occurring. There were over 70 medical professionals, largely county professionals, who talked about the sort of harms that were being exhibited. In fact, there were five studies, most of them county commissioned or county committed, that supported the Court's findings. But I want to enlarge just a moment because I think counsel gives way too short shrift to the findings themselves. This isn't a case, Your Honor, where there's a reduction of four or five family doctors and the county has to... Let me ask you this, though, because I see the standing issue as somewhat different under state and under federal law. The argument under federal law is, as I understand it, that Medicaid requires an adequate plan for discharge. That's the argument, right? That's correct, Your Honor, generally that's correct. That there has to be a planning process in place, there has to be identification of the patients themselves who require discharge planning, that there has to be appropriate notification, and then ultimately, and I'm referring specifically, Your Honor, to 42 CFR 42.43, that there be transfer, the hospitals must transfer or refer patients along with necessary medical information to appropriate facilities, agencies, or outpatient services as needed for follow-up and ancillary care. So the standing question with respect to federal law is somewhat tighter or more focused than with respect to state law, where it's probably enough, listen, under state law, I'm delayed and therefore my services are being adversely affected. Do we have an individual plaintiff for whom it is a realistic possibility or threat that a discharge plan will be badly managed in violation of Medicaid? We do, Your Honor, in three respects. First of all, remember this case was brought on behalf of eight individual plaintiffs and was also brought on behalf of an association. With respect to the eight individual plaintiffs, Mr. Rabb, whom I personally met with, who's a gentleman who's paralyzed from the neck down, were it not for Rancho Los Amigos, he would have no use of any part of his body below the neck. He would have emergency room access only. He remains an outpatient at Rancho Los Amigos. Ms. Haggerty is a 46-year-old diabetic. Your Honor is familiar with the record. One of the specializations of Rancho Los Amigos is with respect to those individuals. She has already had her left toe amputated. She has not yet had a foot amputated. That remains a risk. Rancho Los Amigos is closed tomorrow. She will have no place to go. How broad is the definition of discharge? That is to say, these people are not currently hospitalized. Does discharge mean removed from the hospital or does that mean just transfer of responsibility for care? What does discharge mean? It clearly means under the care of that particular facility itself. It would not have to be in that bed. The regulations, the statute itself say that. Once an institution takes over primary care of an individual, that institution, if it's going to take Medicaid funds, is going to be legally responsible for that individual's care. So it means more than what we would in lay language say, discharge from the hospital, meaning you were in a bed and now you're sent home? Well, I resist using the word lay because I think the lay understanding is if I and Mr. Raab goes every week to that facility and tomorrow that facility, he goes to that facility and it says closed because the county chooses to close the facility, he's been discharged from that facility. Is he now going there weekly? I don't know if it's weekly, but he is an outpatient at that facility. And goes there regularly? He is gone. In addition, the district court specifically found, and this is in the first paragraph of the conclusions, but she refers to the record I talked about that members of the association in this particular instance require continuing health care from the facilities, including Rancho Los Amigos. One final point that I suppose I want to make with respect to this argument, this isn't anything like Worth or it certainly isn't anything like Simon. In the Simon case, the need was, remember that was the IRS regulation. The suit, as Justice Powell repeatedly said, wasn't against individual hospitals. It was against the IRS. Most of the plaintiffs could say in Simon was that there was an encouragement to stop discrimination. Therefore, if the regulations were enforced, there would be a discouragement. They couldn't show that if the IRS, those were schools by the way, if that IRS regulation went away, Simon is a hospital. If that regulation went away, that would change the practices of any of those hospitals. In Worth, there was no showing. People didn't even live in the community. They couldn't show that because of that zoning ordinance that that would have somehow affected a private individual to build particular housing. In this case, whether you're talking redressability, traceability, injury, the story is the county. These are county facilities. In paragraphs 12-18 of the district court's findings, the court specifically finds that that's what makes this case so unique. If these facilities are closed, the county will not be able to meet the needs of the county indigent population. 15. The county hospital system is not equipped to absorb the additional patients from Rancho and LAUSC. It's a system that we're talking about. This isn't just the straw that broke the camel's back. This is removing all the orthopedists. They are completely removing those portions of the system that are necessary for appropriate emergency trauma and rehabilitation care. That's why this isn't anything like Simon. Clearly, standing exists under Article III. Unless the Court has questions, I'll let Ms. Rivera talk about the state law issues. Thanks. Good afternoon, Your Honor. I just wanted to make a couple of points. One, the appellants raised the issue of tailfeather and how this case is identical to the tailfeather case, and I'd like to make a point on distinguishing that. The California Supreme Court has twice talked about the amount of discretion that counties have when they administer their 17,000 and 10,000 programs. Yes, the counties have discretion, but they must exercise that discretion only within fixed boundaries. And the court must strike down standards which fail to fill the objectives of 17,000 and 10,000. And no claims that they're merely an exercise of administrative discretion can sanctify them. And for that reason, tailfeather can be easily distinguished. Both the parties in tailfeather and the court in tailfeather specifically said that tailfeather was a very, very narrow case. It only dealt with whether Los Angeles County was required under 17,001 to adopt formal written waiting time standards when it already had waiting time standards. It was complying with those waiting time standards, and the patients in that case had no argument or problem with the waiting time standards, and the court felt that that fit within the boundaries of the county's discretion. But here, Your Honor, is a different case. And appropriately, the district court found that LA County abused its discretion. It was faced with the testimony of approximately 70 medical professionals, many of them working for the county, all unanimous on the harm that would befall if these closures went through, including overwhelming the private and public emergency rooms, a shortage of beds throughout the county, in particular rehab beds, and dangerous delays in rehab care. If anything was an abuse of discretion, this was. There was simply no factual evidence whatsoever in front of the board that could justify its decision to cut. No single person testified that the county would somehow be able to provide subsistence medical care, much less any appropriate level of medical care should these closures go through. Finally, Your Honor, I wanted to address the other point that the appellants raised with regards to the budget problems. The California legislature has designated the policy that the services that are provided under $17,000 and $10,000 must be given the highest priority. These are our life-saving services. And for that reason, and we cite throughout in our brief, the courts have been unanimous that claims of fiscal distress, even when they're meritorious, do not excuse a county's noncompliance because we cannot provide more important services than these medical services. Further, Your Honor, the county exaggerates the extent of its budget problems. As was said previously, the budget deficit is not going to be reached until 2005, 2006. But in July of 2003, after the injunction was issued, the county discovered that it had underestimated the amount of its budget surplus by another $100 million. So it's always been of dubious reliability, their projections. Third, Your Honor, their claims of fiscal distress ignores some of the evidence which was within the record with regards to the higher costs that would result if these cuts go through, higher costs resulting from longer rehospitalizations from patients whose conditions worsen because they couldn't get rehab care, malpractice claims, and other reasons. For that reason, the district court found that the public interest heavily favored the granting of this injunction because if these cuts went through, patients, especially Los Angeles County patients needing trauma care would be endangered and they would suffer as well if they were denied rehab care. Thank you, Your Honor. I thank you. One point on the standing on the Medicaid claim talking about the discharge services, and the response kind of went a little far afield here. The Medicaid Act claim is talking about the discharge planning, and I invite the Court again to look at the record. I think you will not find a record of a particular plaintiff who is showing a lack of discharge planning services with respect to their individual case. I think, as I noted, the only person that appears to qualify of the plaintiff class was the current inpatient that would be eligible under those regulations. Can I ask you the question I asked of the other side? What does discharge mean in this context? Discharge from the county facility to other care. And it's an inpatient status, as I understand it, looking at the regulations. As you understand it, there's a little question. Yeah. I mean, not everyone qualifies. You have to actually need particular follow-up care. Are you saying that someone who's a regular outpatient at the hospital cannot be discharged within the meaning of this concept? Cannot be discharged? We went back and forth. Someone, let's hypothesize, comes to the hospital once a week for outpatient care. And the person is then said, okay, you can't come here anymore. Is that a discharge? My understanding is that it's an inpatient requirement. You have to be an inpatient, an admitted inpatient. It's not an outpatient requirement. So discharge, in your view, means only, okay, you were in the hospital for three days on the bed. You're sent home. But that's the only thing that discharge means. As I understand it, the regulations that were litigated here, yes. And do you have any case law that says that? I'm talking about the regulations. It's the text of the regulations. I don't think there's case law on it. Okay. That's my understanding of them, and I think that's how it's been litigated here. The other thing on Tailfeather, and again, to look at the case closely, because plaintiffs say, well, the district court noted that in Tailfeather, the plaintiffs had no problem with the county's informal triage policies. Well, no, they had a problem because their argument was you just have a policy, an informal policy. It's not a formal policy. And because of this, we have this litany of injuries, including delay in treatments, complications, and the like. I mean, the allegations in the Tailfeather case look awfully close to the general allegations here that we're getting on the reduction of beds. And what the court said in Tailfeather was, look, the county has a policy, whether it's informal or formal, but it has a policy, just as we have policies on treatment here. No specific service being sought, not good enough to show a violation of the county's obligation or abuse of its discretion under the Welfare and Institution Code provision. And I submit we have the same situation here, that this is remarkably similar to Tailfeather in that notion that the plaintiffs weren't alleging an injury there, that the informal policy was okay. No, because they said the same thing. You don't follow the informal policy. We need a formal policy. So with that, unless the Court has further questions, I would submit. Thank you very much. The matter is submitted, and the Court will recess until 9 a.m. tomorrow morning.
judges: Pregerson, Cowen, W. Fletcher